**In re JENKINS CLINIC HOSPITAL FOUNDATION, INC., Debtor.**

**JENKINS CLINIC HOSPITAL FOUNDATION, INC., Plaintiff.**

v.

**Herman DOTSON, Trustee and Ernest Earl Musgrave, Jr., Defendants.**

**JENKINS CLINIC HOSPITAL FOUNDATION, INC., Plaintiff,**

v.

**Florene Musgrave SIMPSON, Defendant.**

Bankruptcy No. 71–844.
Ancillary Nos. M3–81–10002, M3–81–10003.

United States Bankruptcy Court,
E. D. Tennessee.

March 22, 1982.

William S. Howard, and James R. Odell, Lexington, Ky., for plaintiff, Jenkins Clinic Hospital Foundation, Inc.

Willard M. Hamblin, Lexington, Ky., for defendant, Herman Dotson, trustee.

Bing Irvin Bush, Lexington, Ky., for defendant, Ernest Earl Musgrave, Jr.

James E. Nunley, Bristol, Va., and Paul Sherwood, Erwin, Tenn., for defendant, Florene Musgrave Simpson.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

In this Chapter XI Bankruptcy Act case, filed November 1, 1971 (No. 71–844, Eastern District of Kentucky), the debtor/Foundation has objected to the allowance of two claims: (1) the claim of Dr. Ernest Earl Musgrave, Jr., in the amount of $1,563,400.00; (2) the claim of Florene Musgrave Simpson (Mrs. Musgrave), in the amount of $2,000,000.00. In addition, the debtor seeks affirmative relief against Dr. Musgrave in the amount of $8,582,837.18;

Mrs. Musgrave in the amount of $6,246,561.01.[1] The Musgraves' claims arise from the sale of a hospital and related properties to the Jenkins Clinic Hospital Foundation, the debtor (hereafter, debtor or Foundation), in 1969. The debtor's counterclaims allege violation of Kentucky Blue Sky laws; Rule 10(b) promulgated by the Securities and Exchange Commission; fraud; misrepresentation; and breach of fiduciary duties. Trial was held August 3, 4, and 5, 1981. Post-trial briefs have been filed.

I

In April 1957 Dr. Ernest Earl Musgrave, Jr. began the practice of medicine in Jenkins, Kentucky, a small town in Southeastern Kentucky near the Kentucky-Virginia border. In June 1962 he opened the first wing of the Jenkins Clinic Hospital, a facility with 20 beds, a delivery room, operating room, scrub room, and recovery room. According to Dr. Musgrave, the hospital was unique in that it was Kentucky's first all-electric hospital. Subsequently, a second and a third wing were added which increased capacity to 106 beds.

Between 1962 and 1963 three corporations were formed by Dr. and Mrs. Musgrave to control the operations and property of the hospital.[2] The hospital was owned and operated by Jenkins Clinic Hospital, Inc. The hospital's laboratory was owned by Jenkins Clinic Laboratory, Inc. The real property including several residences were owned by E & F Realty Company, Inc. The stock of these corporations was principally owned by the Musgraves.[3] Dr. Musgrave served as the president of the corporations and Mrs. Musgrave served as secretary-treasurer. In addition, the Musgraves constituted the boards of directors, holding periodic board meetings.

Dr. Musgrave served as medical director of the hospital until 1969. From 1969 until 1973, he worked at the hospital as a staff physician. On August 19, 1971, he filed a petition in bankruptcy (No. 71–831, Eastern District of Kentucky). Herman Dotson was appointed and continues to serve as trustee. Since 1973, Dr. Musgrave has practiced medicine in Paintsville, Kentucky.

Mrs. Musgrave served as hospital administrator from the creation of the hospital until August 1970. Since that date, she has had no further connection with the hospital. The Musgraves were divorced in February 1969.

II

In July 1966 Congress established the Medicare program to provide medical insurance for aged and disabled persons. In July 1967 Kentucky developed its Medicaid program which operated under the same "reimbursement rate" as the Medicare program. The Jenkins Clinic Hospital participated in these programs. Periodic payments would be made to the hospital based on a per diem rate fixed by Medicare. At the end of each fiscal year, after an audit was completed, an "allowable cost" figure was determined. This "allowable cost" figure was then used to determine the amount of reimbursement the hospital was entitled to receive for that year. If a greater amount had been advanced by Medicare during the year, the hospital was required to refund the overpayment.

Prior to 1969, the hospital had experienced difficulty with the Medicare/Medicaid program. As a result of an audit conducted by Medicare, certain hospital costs were disallowed.[4] Medicare requested that these overpayments be refunded. After an

1. The debtor's objections and counterclaims were filed August 23, 1978, and March 22, 1978, respectively.

2. In addition, the Musgraves created Jenkins Construction Co. A portion of the hospital construction was done by this corporation.

3. Initially, the stock had been owned by the Musgraves and others. However, with the exception of one share of stock held by Joseph Mellott, all of the stock was thereafter acquired by the Musgraves.

4. It is sufficient for present purposes to note that the disallowed items included the cost of patient telephones, televisions, and a DC–3 airplane owned by the hospital.

administrative hearing in Chicago in February 1970 the hospital was found to owe Medicare/Medicaid in excess of $400,000. No appeal from this administrative determination was taken by the hospital.[5]

In 1969 the hospital was experiencing cash flow problems. According to the Musgraves, the major cause was the delay encountered in obtaining Medicaid/Medicare payments. In addition, the Musgraves had been unable to obtain long-term financing for the various additions to the hospital. As a result, construction had been financed by the use of short-term borrowing.

### III

Prior to 1969 Dr. Musgrave became aware that the Medicaid/Medicare organizations disapproved of the private ownership of hospitals. See Coll.Ex. 11, July 14, 1966, letter from Duane Harper to Florene Musgrave. Similarly, Medicare had expressed disapproval of the separation of the Jenkins Hospital into three separate corporations, all owned by the Musgraves. The problems with Medicare/Medicaid, the failure to obtain long-term financing, and probably other reasons, which are not too clear from the record, resulted in a decision by the Musgraves to transfer the assets of the hospital corporations to the Jenkins Clinic Hospital Foundation, Inc., which previously had been operated by them as a home health care service. Dr. and Mrs. Musgrave apparently constituted the Board of Trustees.

Telephone calls and personal contacts were made by the Musgraves and others with individuals who would constitute a new and enlarged Board of Trustees. These contacts resulted in a meeting in October 1969 with prospective members of the new Board.

Those invited to become trustees included Ray Mullins, the Superintendent of Industrial Relations for Beth Elkhorn Corporation; James M. Caudill, a county judge and banker; Dr. Arthur Nash, a practicing physician at the hospital; Joe Eversole, a phar-macist and owner of a local drug store; Elsworth Knight, an engineer; Raymond Collins, a businessman, legislator and preacher; William Hettisheimer, an insurance man who had assisted the hospital with its insurance program; Bill Clarke, a pharmacist; and Richard Cooper, an attorney who served only about a month.

In October 1969, when the new Board was organized, Dr. and Mrs. Musgrave resigned from the Board.

The evidence is conflicting as to whether the financial condition of the hospital and its related facilities were discussed at the October meeting. Witnesses testifying on behalf of the Foundation generally state that financial conditions were not discussed either at the October meeting or at a subsequent meeting in November. They also insist that the hospital's problems with Medicare/Medicaid were not brought up. Witnesses testifying on behalf of the Musgraves insist that the contrary is true—both the financial condition of the hospital and the Medicare/Medicaid problems were fully discussed.

On November 20, 1969, a stock agreement was executed by the Musgraves and Joseph Mellot, the stockholders of the three corporations, and by Arthur Nash as President of the Jenkins Clinic Hospital Foundation, Inc. The agreement provided for the purchase of the hospital facilities and required the Foundation to deliver to the stockholders promissory notes for the $2,000,000 purchase price. Ex. 1. Mrs. Musgrave received a promissory note in the amount of $433,000, Ex. 9, and Dr. Musgrave received a note for $1,563,400, Ex. 8. The purchase price was subject to adjustment on the basis of an appraisal "to be made by such appraisers as are acceptable to the Foundation and its Stockholders." Ex. 1.

The new Board took over the hospital and related facilities on December 1, 1969. Shortly thereafter, the Board of Trustees employed Joe P. Gorman, an experienced real estate agent and appraiser from Haz-

---

5. The attorney for Herman Dotson, trustee, insists that the time for appeal has not expired.

It is not necessary to consider that matter in the present Memorandum, however.

ard, Kentucky, to conduct an appraisal of the hospital, the real estate, and the residences. After a meeting with the board, Mr. Gorman inspected the property and, after this inspection, appraised the property at $1,910,800.00. Ex. 1, June 10, 1981, Deposition of Joseph P. Gorman.

Subsequently, in January 1970, new notes were executed by the Foundation to replace the former notes given to the Musgraves, each being in the amount of $997,300.

## IV

In 1971 the Jenkins Clinic Hospital Foundation, Inc. filed a petition for an arrangement under Chapter XI of the former Bankruptcy Act. 11 U.S.C. § 701, et seq. (Repealed 1978). Thereafter, Mrs. Musgrave filed a proof of claim in the amount of $2,000,000. Herman Dotson, as trustee in bankruptcy for Dr. Musgrave, filed a proof of claim in the amount of $1,563,-400.00.[6]

On March 22 and August 23, 1978, the Foundation filed objections to the Musgraves' claims. In addition, the Foundation filed counterclaims against Mrs. Musgrave seeking judgment in the amount of $6,246,-561.01, and against Dr. Musgrave seeking judgment in the amount of $8,582,837.18.

The Foundation maintains that in the sale of the hospital facilities to the Foundation, Dr. and Mrs. Musgrave fraudulently and intentionally misrepresented certain material facts and omitted other material facts. The Foundation alleges these misrepresentations and omissions were relied upon by the Foundation to its detriment. Specifically, the Foundation insists that the Musgraves either omitted information or provided false information to Joe Gorman, the appraiser, concerning the assets, liabilities and earnings of the hospital so that the appraisal given by Gorman was based on false and incomplete information. The Foundation says the Musgraves also understated the amount claimed by Medicare/Medicaid. The Foundation also argues that, while acting in a fiduciary capacity,

Dr. Musgrave authorized payment of corporate funds to himself and others in the amount of $87,401.63, and that Mrs. Musgrave authorized payments to herself and others in the amount of $37,053.00. According to the Foundation, the Musgraves also violated their fiduciary duty by authorizing the transfer of a $40,000 house owned by the Foundation to Joe Eddie Eversole for $15,000. In addition, the Foundation claims that Dr. and Mrs. Musgrave are indebted to the Foundation in the amount of $29,385.55 and $18,508.01, respectively, for unauthorized disbursements to themselves and to other persons while acting in a fiduciary capacity.

The Foundation insists that the notes executed to the Musgraves for the purchase of the hospital facilities were executed as the result of false representations; that said notes resulted from the use and means of instrumentalities of interstate commerce and the mails of the United States, in violation of Rule 10(b) of the Securities Exchange Act of 1934.

Similarly, the Foundation contends that the Musgraves' omissions and untrue statements of material facts operated as a fraud and deceit upon the Foundation in violation of Kentucky's Blue Sky Law. K.R.S. § 292.320. The Foundation seeks damages pursuant to K.R.S. § 292.480.

The Foundation asks that the Musgraves' claims be disallowed, that judgment be rendered against Dr. Musgrave in the amount of $8,582,837.18, and that judgment be rendered against Mrs. Musgrave in the amount of $6,246,561.01.

The Musgraves deny they are guilty of any fraud, deceit, or breach of fiduciary duty. In addition, both Dr. and Mrs. Musgrave argue that the relief requested in the debtor's counterclaim is barred by the statute of limitations, estoppel, waiver, and laches. Also, Mrs. Musgrave in a third party complaint against the Foundation alleges that it had defaulted on its obligations to her under the stock purchase agreement

---

**6.** Subsequently, the claims of both Dr. and Mrs. Musgrave were amended: Mrs. Musgrave's claim to $777,836.37; Dr. Musgrave's claim to $925,067.00.

and that she should be restored to ownership of the assets transferred to the Foundation.[7] In addition, Mrs. Musgrave seeks judgment against the Foundation in the amount of $1,995,000.00, with 8½% interest per annum from December 1, 1969. Dr. Musgrave, in a third party complaint, also seeks judgment in the amount of $1,563,400.00, plus interest at the rate of 8½% per annum from December 1, 1969.

## V

■ In order for fraud to be actionable, there must be a material representation which is false and which is known to be false at the time it is made, or which is made recklessly without knowledge of its truth. Further, the statement must have been made with the intention of inducing someone to act, and that person must, in fact, have acted in reliance upon the statement and be injured thereby. *Scott v. Farmers State Bank*, 410 S.W.2d 717 (Ky. App.1966).

■ An affirmative falsehood is not required to support a finding of an actionable misrepresentation. *Minish v. Huey*, 482 F.2d 500 (6th Cir. 1973). The courts of Kentucky have held that concealment of the facts can constitute actionable fraud.

" . . . [M]ere silence with respect to something related to a transaction is not necessarily misrepresentation and does not itself constitute fraud. However, it is otherwise when the circumstances surrounding a transaction impose a duty or obligation upon one of the parties to disclose all the material facts known to him and not known to the other party. The suppression or concealment of the truth under such circumstances may constitute a means of committing a fraud as well as misrepresentation openly made. Since the beginning of our jurispurdence, the principle has been consistently adhered to that the concealment by a seller of a material defect in property being sold, or

the suppression by him of the true conditions respecting the property, so as to withhold from the buyer information he is entitled to, violates good faith and constitutes deception which may relieve the buyer from an obligation or may permit him to maintain an action for damages or to vacate the transaction (citations omitted)." *Hall v. Carter*, 324 S.W.2d 410, 412 (Ky.App.1959).

The case of *Hall v. Carter*, supra, illustrates that, when the sale of real estate is involved, the Kentucky courts impose an affirmative duty on the seller to tell the salient facts within his knowledge. In that case, Carter purchased an apartment house and lot from Hall and Reynolds. Carter left a check for the $17,000 purchase price with an officer of the bank who was also holding an executed deed. Carter notified the bank not to deliver the check when he learned there was a dispute as to the back boundary of the lot; i.e., whether the lot was 60 feet in depth as per the deed, or 56 feet in depth as claimed by the adjoining landowner. In fact, prior to the transaction with Carter, Hall and Reynolds had been "evicted . . . 'from about a four foot strip of land' " by the adjoining landowner. The court concluded that, due to the failure of the vendors to reveal the claim of the adjoining landowner and their failure to reveal that the lot was only 58 feet deep as opposed to 60 feet deep, Carter was entitled to stop payment on the check and rescind the agreement. While the vendors may have believed their lot had a depth of 60 feet, they had an obligation to reveal the true facts of the unsettled controversy with their neighbor. Carter, therefore, was permitted to rescind his contract.

In the present case the Foundation maintains that it has sustained its burden by proving that the stock purchase agreement and the contract for the sale of the real estate were executed as the result of fraud and misrepresentation on the part of the

7. Paragraph 10 of the Stock Purchase Agreement states as follows:

"In the event of a default in payment hereunder, the Stockholders have the right to declare the Agreement null and void and to receive such assets of the Foundation as are attributable to the Hospital and the Lab." Ex. 1.

Musgraves. The first element which must be proved is the existence of a material representation that is false. The Foundation contends that proof of such material false statements is evident from the testimony of three trustees of the Foundation. Each of these trustees testified at trial regarding the October and November 1969, meetings of the Foundation's Board of Trustees when the members of the Board were selected and the contracts were approved.

Ray Mullins, who was appointed to the Board of Trustees in November 1969, testified that Dr. Musgrave was the first to speak at the October meeting. According to Mr. Mullins, Dr. Musgrave explained the purpose of the meeting; i.e., that it was necessary to create a nonprofit hospital corporation to own and operate Jenkins Clinic since "it was frowned upon for individuals to—to own a hospital and make money from taking care of sick people...." Transcript of Proceedings, p. 94 (hereafter cited as Tr.). In addition, Mullins testified that both Joseph Mellott, the hospital's accountant, and Bernard Long, a Washington attorney who had represented the hospital in its dispute with Medicare/Medicaid and who drafted the legal documents involved in this controversy, spoke at the October meeting. Mullins stated that Bernard Long talked about the structure of the Foundation. Tr. 98. Joseph Mellott talked about the financial condition of the hospital, referring to the earnings of the hospital during previous years as approximately $100,-000 per year. Tr. 98.

On direct examination by counsel for the Foundation, Mullins testified the Medicare dispute was discussed by Joseph Mellott:

"A. It (the discussion) was—as I recall there—the dispute, as I said, involved cost or charges from billings of the Jenkins Clinic. It specifically involved charges related to an airplane...."

8. The pertinent part of Exhibit C states as follows:

"2) Medicare overpayment for Fiscal Years ended 1966–1969 (contingent)—estimated at

Q. Was there any indication to you about the size of the controversy in terms of money?

A. As I remember, it was something like—$400,000 sticks to my mind. I can't recall the exact numbers, but it was a sizeable sum of money." Tr. 98, 99.

However, after a recess, Mr. Mullins amended his testimony to indicate that, in fact, no amounts were discussed during the October meeting. Tr. 99.

Mr. Mullins also described the second meeting of the Board in November 1969. Without being specific, Mullins stated that in the November meeting "it was indicated that it (the hospital) was a going thing, that they had sufficient monies to pay their bills and that kind of thing." Tr. 102. Once again, the $100,000 yearly profit was mentioned. Tr. 102. Finally, Mullins testified that the Board was not informed of any existing "financial emergency," that members of the Board only discovered the gravity of the situation after the transfers had occurred and the Foundation became unable to meet its payroll and pay for supplies. Tr. 105, 108.

Mr. Mullins testified on cross-examination that he could not remember if each Board member had been given a copy of the stock purchase agreement at the November meeting, or if Bernard Long discussed the Agreement in detail. Tr. 117. In addition, Mullins was unable to recall the details of the Medicare/Medicaid dispute referred to in Exhibit C attached to the stock purchase agreement. Tr. 117.[8]

Raymond Collins was elected to the Board of Trustees in 1969 and attended both the October and November meetings. Collins denied that Joseph Mellott made any specific statement regarding the approximate earnings of the hospital:

"Q. Did he make any representations with respect to the approximate earnings of the hospital for the period prior to the meeting?

maximum of $100,000.00. The amount payable to Stockholders shall be reduced by the amount of this liability as finally determined."

A. No. Just—just that it was making good money." Tr. 239.

Further, Collins testified there was no mention of the Medicare/Medicaid dispute at the first two or three meetings of the Board of Trustees. Tr. 239.

According to Collins, he understood the hospital to be in good financial condition. No information was presented at the October or November meetings to indicate the hospital was in bad financial condition. Tr. 241.

Collins further testified there was no mention of the Medicare/Medicaid dispute at either of the first three board meetings. Tr. 239. He stated, however, that he would probably have approved the purchase of the hospital even if he had been aware of potential liability to Medicare of "more than $500,000." Tr. 241.

The final member of the Board of Trustees to testify was Dr. Arthur Nash. Dr. Nash had been on the hospital staff some eight or nine years prior to 1969 and became president of the new Board of Trustees in November 1969. He resigned from the Board in 1974. Dr. Nash testified that the financial condition of the hospital was discussed at the October 1969 meeting; that he was unable to remember the details of the discussion but recalls that the hospital was portrayed as being in sound condition. Tr. 206. As a result of this discussion and a discussion concerning the past earnings of the hospital, Dr. Nash stated that he understood the hospital was in "sound condition." Tr. 206. Nor was this impression corrected at the November meeting of the Board. Tr. 208. Similarly, Dr. Nash testified that he did not become aware of the Medicare/Medicaid dispute until "several months" after the October meeting. Tr. 207.

While Dr. Nash could not remember specifically, he did not deny that each member of the Board was furnished a copy of the stock purchase agreement. Dr. Nash also could not specifically remember but he did not deny that Bernard Long discussed the proposed agreement extensively during the November meeting. Tr. 217.

Mrs. Musgrave was also present at the October meeting. She testified that Bernard Long discussed in general terms the reason why the transfer to the Foundation was contemplated. Tr. 512. Mrs. Musgrave also testified that at the November meeting Mr. Long presented the stock purchase agreement and that it was discussed "thoroughly." Tr. 513. In addition, Mrs. Musgrave stated that at the November meeting Joseph Mellott discussed the hospital's financial condition and gave each member of the Board a copy of the latest balance sheet for the hospital. Tr. 513.

Mrs. Musgrave further testified that she spoke with several members of the Board prior to the November meeting. Specifically, she testified that she discussed the financial condition of the hospital with Bill Clarke, a part owner of a local pharmacy who had been concerned about delays in receiving payment from the hospital. Tr. 510. Similarly, she had explained the cash flow difficulties of the hospital to William Hettesheimer in a discussion as to why insurance premiums had not been paid every 30 days. Tr. 511.

Dr. Musgrave also testified but was unable to recall specifics concerning the October and November meetings of the Board. He emphatically disputed, however, Dr. Nash's assertion that he had been led to believe the hospital was in sound financial condition. According to Dr. Musgrave, the hospital's cash flow problems had been discussed with Dr. Nash "almost on a daily basis." Tr. 439. Dr. Musgrave's testimony is supported by the testimony of Ms. Cora Lea Rabon, formerly the Assistant Administrator of the hospital. Tr. 332.

Ms. Rabon stated she was present at conferences held over a period of several years when cash flow problems were discussed. Dr. Nash was also present at some of these conferences, and, specifically, had attended at least two conferences between Dr. and Mrs. Musgrave and Bernard Long. Tr. 348, 349.

The testimony of Ms. Rabon and the testimony of Bernard Long negate the Foun-

882

dation's contention that the members of the Board of Trustees were not informed of the Medicare/Medicaid dispute or the possible extent of the hospital's financial difficulties at the October and November meetings. Ms. Rabon testified that Mr. Long briefly discussed the Medicare dispute at the October meeting; i.e., he explained that several costs had been disallowed by Medicare, specifically the costs allocated to the airplane, televisions, and telephones. Tr. 338, 339. Similarly, Ms. Rabon testified that the stock purchase agreement was presented in detail during the November meeting by Mr. Long; further, that the members of the Board were given copies of the Agreement. Tr. 353. In addition, Ms. Rabon testified that she had discussed the Medicare dispute separately with several members of the Board. Specifically, she recalled speaking with Mr. Hettesheimer over the phone:

"I called him the day that we received the letter from Mr. Harper, and I read the letter to him over the telephone on the disallowed costs. He had been involved in insurances at the hospital in the past.

. . . . .

"He had been told by myself and Doctor and Mrs. Musgrave in my presence of the situation with Medicare and Medicaid and what contingencies we would be up against possibly." Tr. 363.

According to Ms. Rabon, Judge Caudill had also been informed of the Medicare dispute:

"Q. Had you talked with Judge Caudill?
A. Judge Caudill was at one of the meetings, and also I talked to him between the two meetings; and that's at the time about the situation with problems at the hospital. Judge Caudill was still a little leery of becoming a member of the Board and at that time stated that possibly one of the inducements that might make him decide that he wanted to become a member—he was the President of the First Security Bank of Whitesburg and Neon, Kentucky—was if we would

switch our account from our current checking account to his bank.
Q. Did you tell him of the problems, or did anybody else tell him of the problems that the hospital was experiencing in your presence? Was he told, not did he know but was he told.
A. He was told at the meetings. Yes." Tr. 364.

Between the October and November meetings Ms. Rabon was asked about the Medicare dispute by Elsworth Knight, who had been invited to become a member of the Board of Trustees. Ms. Rabon testified that she told Mr. Knight that the decision to disallow certain hospital costs had been appealed and that "no one would know the exact figure until after the hearing was held." Tr. 364, 365.

Bernard Long testified that each member of the Board was presented a copy of the stock purchase agreement. Mr. Long stated that during the November meeting he read every word of the agreement to the Board, after which a general discussion was held. The Medicare/Medicaid dispute was discussed on an "issue basis":

"In other words, it's my recollection that we talked about what the issues were pending at the medicare hearing which had been—I'm not sure if it had been scheduled at that time or not, but pending as a result of Medicare audits. In terms of—well, I know the issues were discussed, the significant issues, the—problems with the related corporations so to speak, the—the salaries and so on and so forth." Tr. 480, 481.

Long's testimony, supported by the testimony of others, and the fact that "Exhibit C" was attached to the stock purchase agreement at the time the agreement was executed, convinces this court that the Board of Trustees was informed of the Medicare/Medicaid dispute prior to the execution of the agreement. It is true that the maximum liability to Medicare/Medicaid is shown in "Exhibit C" as $100,000; however, the testimony of Bernard Long discloses how this figure was reached:

"[M]y recollection as to how that—that particular number was arrived at is not entirely clear; but I was involved in it in terms of estimating what I estimate— what I felt would be the ultimate chances of success on the various issues that we were faced with, and by that I mean through court, through this—through the administrative process—that the Bureau of Health Insurance or Social Security, or whatever it was, had set up—through court review after that and perhaps political assistance after that—whatever. We tried to—I tried to make an estimate of where I thought the equities were in these issues and where I felt we would ultimately—ultimately end up, and Mr. Mellott—I know I worked with Mr. Mellott on this and we tried to get from Mr. Mellott an estimate of what the dollar amounts were potentially with respect to each issue up to that period of time; and so it's—it was really a combination effort of at least the two of us. I don't—I don't recall specifically anybody else being involved at that point. It's possible, but—

Q. Do I understand your testimony to be that you and Mr. Mellott worked on this and—as a projection and that's what you came up with, the $100,-000.00 figure?

A. That was our estimate at the time. We—we felt that, at least for purposes of the Contract that something out of these scores—what it could have been was a—was a—no—this is 1969—I had been practicing law for three years; and maybe my—my optimism isn't relevant, but I—my—feeling was that we had very legitimate cases to present on all of these issues and that ultimately we would prevail on several of them. By ultimately I mean in the long run, and that's where the numbers came from." Tr. 481, 482.

■ While the ultimate liability was considerably in excess of the $100,000 amount specified in Exhibit C, the testimony of Bernard Long indicates that the $100,000 figure represented a valid estimate at that time. No proof has been produced to indicate that either Dr. or Mrs. Musgrave in any way intentionally misrepresented the facts to Bernard Long to induce him to arrive at a lower Medicare liability. The court concludes that the estimate of liability shown in Exhibit C resulted from the exercise of independent professional judgment by Bernard Long. It is, therefore, the finding of the court that the Musgraves did not mislead the Board of Trustees concerning the Medicare/Medicaid dispute. Nor did they conceal information. The representation that the ultimate liability would not exceed $100,000 was not made with an intent to deceive. See *Bolling v. Ford*, 213 Ky. 403, 281 S.W. 178 (1926); *Johnson v. Cormney*, 596 S.W.2d 23 (Ky.App.1979).

It is also the finding of this court that the Foundation has failed to show that the Musgraves fraudulently and intentionally misrepresented the financial condition of the hospital when the sale occurred.

## VI

On December 13, 1969, the Board of Trustees appointed Joe P. Gorman to appraise the hospital, laboratory, and real estate. Gorman thereafter inspected the property and placed a valuation for the real estate and for the hospital as a going concern at $1,910,800.00. In making this appraisal, Gorman used the audited financial statements for the prior five years. This information was provided by Joseph Mellott. The Foundation contends that the Musgraves and Joseph Mellott "fraudulently, wrongfully and intentionally provided inaccurate and incorrect information to Joe P. Gorman in order to secure an inflated appraisal. . . ." Para. 9, Plaintiff's Complaint.

In order to sustain this position, the Foundation introduced the testimony of Leslie Baynham, a CPA from Lexington, Kentucky, who has been the accountant for the Foundation since 1978. *See* Order of October 9, 1978. After reviewing the general ledgers and other documents, and the audited financial statements prepared by Joseph Mellott for the years 1966–1969, Mr.

Baynham made certain adjustments to the income statements prepared by Mellott. The largest adjustments represent costs that were disallowed by Medicare in the amount of $360,148 and Medicaid in the amount of $234,848. These amounts were deducted from the net income shown on the income statements prepared by Mellott. However, the adjustment for Medicare was based upon a letter dated December 11, 1971, from Roy Whisman, an accountant for Medicare, to Roger Watkins, the hospital administrator. Coll. Ex. 11; Tr. 159, 160. The adjustment for Medicaid was made as a result of an April 13, 1972, letter from Ronnie Cohorn to Betty Hunsaker, Assistant Administrator and Comptroller of the Foundation. The testimony of Bernard Long indicates that in 1969 when the stock transfer occurred Mr. Long was unsure of the amount of the liability to Medicare/Medicaid. In fact, at that time Long estimated the maximum liability to be $100,000.

The only mention of the Medicare/Medicaid dispute in the financial statements prepared by Joseph Mellott appears in the certified audit of January 29, 1969.[9] A footnote in the financial statement indicates the possibility of liability to Medicare/Medicaid.[10] The June 10, 1981, deposition of Joseph Mellott indicates the contingent liability to Medicare/Medicaid was not footnoted in an earlier financial statement because at the time the earlier statements were prepared Mellott was of the opinion that the hospital would prevail in the dispute. The footnote appeared in the January 29, 1969, Statement because at that time Mellott had become convinced the hospital might not prevail. Deposition of Charles J. Mellott, pp. 81–84.

Mr. Mellott explained that, when attempting to place a value on a contingent liability,

"you attempt to get some definition from some outside source on the—the best source available. If it's a litigation, you try to get it from a lawyer, what he thinks the possible outcome will be and how much it may cost, or if he can't determine it, he says he doesn't know, so you put that down. If it's somebody else, an insurance claim, or something like that, you try to get it from an outside authority." Deposition p. 24.

Mr. Mellott relied upon the advice of Bernard Long and the correspondence that had passed between the hospital and the Medicare/Medicaid representatives.

The court is unable to conclude that the income statements prepared by Mellott are incorrect as to the income actually received from Medicare/Medicaid. Further, the court is unable to conclude that the contingent liability to Medicare/Medicaid was fraudulently concealed. At the time the statements were prepared, the disallowance of certain specific costs was being challenged by the hospital. The liability was contingent and did not become "final" until after the statements were prepared. The Foundation has produced no evidence to show that Mellott's treatment of the contingent liability to Medicare/Medicaid was done with any fraudulent intent or that the Musgraves had anything to do with the preparation of the statements.[11]

9. Rouse, Rankin, Brammell & Mellott, Certified Public Accountants.

10. Note 3—"We are assured by the Management that all known liabilities were entered and no contingent liabilities, other than those noted on the balance sheet, were reported to or discovered by us, with the exception of purchase commitments in the course of business, and any liability which may arise from examination by Federal and State Tax authorities, and any liability which may result from audits by Medicare and Medicaid auditors." Ex. 37. Note 3.

11. The testimony of the Foundation's auditor, Mr. Baynham, is enlightening:

"... [A]ny accountant in rendering an opinion or a statement refers to the reasonableness of the statement rather than the accuracy. The accuracy is something that is never pinpointed to a point. It's just a word that accountants rarely use in reference to a statement. I would say that this statement [combined balance sheet, November 30, 1969] renders a fair presentation reasonably of the financial position at that time." Tr. 154.

In its effort to discredit the appraisal of the property made by Mr. Gorman immediately after the transfer, the Foundation introduced as a witness Mr. Charles B. Gates of Marshall & Stevens, Appraisers. Mr. Gates testified that in 1971 his company was contacted by Roger Watkins to appraise the Foundation's properties. Tr. 296. Mr. Gates participated in the appraisal to the extent that he initially prescribed the "specifications" for the appraisal and then assigned Mr. Evan Jones to the project. Mr. Gates later reviewed Mr. Jones' work and after discussions with him approved the appraisal. Ex. 35. The appraisal purports to fix the value of the hospital properties as of December 1, 1969, at $1,138,000.00. This appraisal is on an "assumed debt-free basis." Tr. 300.

Some ten years later, in 1981, Mr. Gates was again requested by the Foundation to "value the entire hospital business [of the Foundation] ... as of December 1, 1969." Mr. Gates reviewed various statements of earnings and combined balance sheets prepared by Mr. Baynham for the years 1965–1969, together with cost reports from Medicare and Medicaid, and fixed the "going concern value" of the hospital as of that date, December 1, 1969, at $175,000.00. Tr. 302. This appraisal was not prepared from an examination of the property but from information furnished to him by Mr. Watkins, Mr. Baynham, and the cost reports prepared by Medicare and Medicaid.

■ Thus, the Foundation is now attempting to substitute for the original appraisal prepared by Mr. Gorman the later appraisals (1971 and 1981) of Mr. Gates. This court cannot and will not overlook the undisputed fact, however, that the *Board* selected Mr. Gorman. There is no credible evidence in this record to indicate that the Musgraves in any way attempted to influence the Board to select Mr. Gorman, or that they attempted to influence Mr. Gorman's appraisal. Mr. Gorman was not contacted by the Musgraves but by Mr. Eversole. He also talked to Mr. Collins. At the time he made the appraisal, he "did not know Doctor or Florene Musgrave Simpson." June 10, 1981, Deposition of Joe P. Gorman, p. 29. The only time he saw Dr. Musgrave was when he "delivered the appraisal."

This court declines to substitute appraisals made long after the transaction was consummated for one made by an appraiser selected by the Board at the time the agreements were entered into.

■ The second adjustment made by Baynham was a $92,587.03 reduction in the net income shown on the statement for the year ending September 30, 1969. Mr. Baynham explained that this adjustment was made to eliminate a gain that had been realized from a sale and leaseback transaction. According to Baynham, the gain from the transaction should not have been recorded on the books. Tr. 163. The third adjustment was for accounts payable. The fourth adjustment was to eliminate an accounts receivable from E & F Construction Company, a corporation owned by the Musgraves. The final deduction was to eliminate the sale and leaseback security deposits. According to Mr. Baynham, these adjustments were made because those items had received improper treatment on the books of the three entities. While these adjustments may have been made to correct errors on the part of Joseph Mellott, as is contended by the Foundation, the Foundation has not met its burden of showing clearly and convincingly that the errors were made with the intent to mislead the board. *Smith v. Barton*, 266 S.W.2d 317 (Ky.App.1954). Nor has any evidence been introduced to indicate that the Musgraves "provided" false information to Mellott in order to secure an inflated appraisal of the property.

### VII

The Foundation alleges that the Musgraves violated the provisions of the Blue Sky Law of Kentucky. In relevant part, that statute provides:

"It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

. . . . .

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." K.R.S. § 292.320.

The Kentucky statute further provides that anyone who offers or sells a security by means of any untrue statement of a material fact or the omission to state a material fact is liable to the buyer for

"the consideration paid for the security, together with interest at six percent (6%) per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, or for damages if he no longer owns the security." K.R.S. § 292.480.

The Foundation argues that the Musgraves violated these statutes; therefore, the Foundation should recover "damages pursuant to K.R.S. § 292.480 in the face amount of said indebtedness with interest thereon...." Plaintiff's Complaint, Paragraph 31. In addition, the Foundation seeks to recover $4,000,000 punitive or exemplary damages from the Musgraves.

■ A reading of K.R.S. § 292.480 which authorizes civil liabilities for the violation of Kentucky's Blue Sky Law does not support the Foundation's request. Under that statute the measure of recovery is the consideration paid by the purchaser for the security plus other costs less "any income received on the security," provided the security has not been returned to the seller. The purchaser may recover *damages* only if he no longer owns the security.

In the present cases, with the exception of several interest payments, no payments have been made by the Foundation to either of the defendants. The Foundation, however, has received considerable income from the property transferred to it.[12] Further, the Foundation has never offered to return the stock and properties to the Musgraves.

■ Even if the Blue Sky Law of Kentucky applies, the finding by this court that the Foundation has failed to establish any actionable fraud or misrepresentation on the part of the Musgraves effectively forecloses any basis for relief under the Kentucky statute.

## VIII

The plaintiff also relies on 15 U.S.C. § 78j(b), which makes it unlawful for any person to make use of an instrumentality of interstate commerce in connection with the purchase or sale of a security in violation of rules prescribed by the Securities Exchange Commission. As does K.R.S. § 292.320, Rule 10b–5 makes it unlawful

"for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The Foundation maintains the transactions in question had sufficient contact with interstate commerce so that Rule 10(b) ap-

---

**12.** At trial it was indicated that the Foundation at this time has liquid assets of some $1,500,-000.00. The financial affairs of the Foundation appear to have improved immeasurably after the employment of Roger Watkins as hospital administrator in 1971.

plies.[13] As a result, the Foundation seeks damages against each defendant in "the full amount of the debt claimed and interest," and, in addition, punitive or exemplary damages in the amount of $2,000,000 from each defendant.

Prior to 1976 the decisions were in conflict as to whether a showing of scienter was required in order to impose civil liability for violation of the antifraud provisions of the Securities Exchange Act. *See* 69 Am.Jur.2d, Securities Regulation-Federal, § 474. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the customers of a brokerage firm who had invested in a fraudulent securities scheme commenced an action for violation of Rule 10(b) against Ernst & Ernst, the accounting firm that had audited the books of the brokerage firm. Plaintiffs contended that Ernst & Ernst "aided and abetted" the broker's 10(b) violation through its negligence in failing to discover the fraudulent scheme. The court concluded with respect to Rule 10(b) that

"use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 96 S.Ct. 1375, 1384.

Further, after considering the legislative history and overall Congressional purpose of the 1933 and 1934 Acts, the Court concluded that 10(b) was intended to provide a remedy for practices that involve "some element of scienter and cannot be read to impose liability for negligent conduct alone." *Id.* 96 S.Ct. at 1385.

For reasons discussed previously, this court is unable to conclude that either of the Musgraves engaged in "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price" of the Jenkins Clinic stock. The Foundation's claim for damages for violation of Rule 10(b) will be denied.

IX

The Foundation argues that Dr. Musgrave, as medical director, and Mrs. Musgrave, as hospital administrator, were acting in a fiduciary capacity; that this fiduciary relationship was violated by Dr. Musgrave and by Mrs. Musgrave when they caused the Foundation to make unauthorized payments to themselves and to other persons. The Foundation alleges that Dr. Musgrave prevailed upon Mrs. Musgrave to make unauthorized payments in the amount of $87,401.63. Similarly, the Foundation alleges Mrs. Musgrave made other unauthorized payments in the amount of $37,053.00. In addition, the Foundation claims the Musgraves violated their fiduciary duty by "fraudulently and wrongfully" causing a house worth $40,000 to be sold to Joe Eddie Eversole for $15,000.

The evidence presented at trial concerning the value of the house conveyed to Joe Eddie Eversole is conflicting. Dr. Nash, who donated the house to the Foundation, testified that he had caused the house to be appraised by Joe Eversole, a member of the Board,[14] and by Jess Bates, a local judge. Their appraisal is contained in a letter dated October 8, 1969, which reads as follows:

"TO WHOM IT MAY CONCERN:

We have examined the residence and lot of Dr. Arthur J. Nash and Sheila Nash on 20 September 1969. In our opinion, the Fair Market Value of this property would be $40,000." Ex. 29.

---

13. The defendant Dr. Musgrave contends that the Kentucky Court of Appeals in *City of Owensboro v. First U. S. Corp.*, 534 S.W.2d 789 (1975), held that the sole remedy for defrauded purchases of securities is Kentucky's Blue Sky Law; therefore, the Securities Exchange Act and Rule 10b-5 are inapplicable. *City of Owensboro, supra,* cannot be used to support that proposition. Since that case involved claims under both the Securities Exchange Act and Kentucky's Blue Sky Law, the case is clearly inapplicable.

14. Joe Eversole is the father of Joe Eddie Eversole.

However, the Foundation produced no evidence regarding the qualifications of either Joe Eversole or Jess Bates. Similarly, no evidence was produced to indicate what methods they used in appraising the property.

The house also was appraised by Joe Gorman, an individual engaged in real estate sales and appraisals. In a written appraisal, Gorman states that based "on similar sales and local market data" the house had a market value of $20,000 as of January 14, 1970. June 10, 1981, Deposition of Joe P. Gorman, Ex. 1.

Dr. Nash claimed an income tax deduction for his donation of the house to the Foundation in the amount of $40,000, arrived at on the basis of the appraisal by Eversole and Bates. The IRS first proposed to allow $15,000, but ultimately allowed $24,000. Dr. Nash says he lost "$8,000.00 worth of income tax." Tr. 232. He conceded that one reason for his donation of the house was to take an income tax deduction. Tr. 230.

At the time of the sale of the house by the Board, the Musgraves were *not* members of the Board.[15] Dr. Musgrave was still the Medical Director and Mrs. Musgrave was Hospital Administrator but her authority had been greatly reduced. While it is true that the Musgraves had a duty to act in good faith, with due care and diligence, the Foundation has presented no proof that would indicate either of the defendants failed to do so or that they profited from the sale. In fact, Dr. Nash testified that the sale of the house was necessary in order for the hospital to meet its January, 1970, payroll. Tr. 210. The court concludes that the Musgraves violated no fiduciary duty with regard to the sale of the house by the Board to Joe Eddie Eversole for $15,000.

Cora Lee Rabon testified as to the procedures followed for writing checks after the transfer to the Foundation occurred. The checks were prepared by Ms. Rabon and signed by Mrs. Musgrave. However, all checks in excess of $500.00 were required to be co-signed by the Secretary of the Board. Tr. 359.

The Foundation introduced a series of checks which it contends represents disbursements which were not authorized by the Board. The Foundation says these payments represent a breach of fiduciary obligations on the part of the Musgraves. *See* Paragraph 20, Plaintiff's Complaint Objecting to Allowance of Claim of Herman Dotson, Trustee; Paragraph 19, 20, Plaintiff's Complaint Objecting to Allowance of Claim of Florene Musgrave. Exhibit 10 consists of 21 checks payable to Florene (Musgrave) Simpson. Each check is written in the amount of $1350.00. Mrs. Musgrave's signature appears on only one of the checks, however, and even that check is also signed by James M. Caudill, a member of the Board of Trustees. The parties have stipulated that, with the exception of one check representing a salary payment, all of the checks were interest payments on the note held by her.

During the first four months of 1970, six checks were written to the Jenkins Construction and Supply Co., a corporation controlled by the Musgraves. Each check is signed by Florene Musgrave and "Joe Eversole Sec'y. and Treasurer." The Foundation argues that it was not indebted to the Jenkins Construction and Supply Co.; thus, these payments constitute a breach of fiduciary duty. The accounts payable ledger for Jenkins Clinic Hospital and the successor Foundation, however, does not support this allegation. To the contrary, the ledger indicates that, at the time each payment was made to Jenkins Construction, a debt was owing to that company.[16] The court

---

15. Dr. Nash, a member of the Board, voted against the sale. Tr. 231. *See* Ex. 29.

16. The amount of each check and the balance owing as of that date as per the accounts payable ledger is as follows:

| DATE | CHECK NO. | AMOUNT PAID | AMOUNT OWING |
|---|---|---|---|
| 1/23/70 | 270 | $3,000 | $ 9,605.01 |
| 3/6/70 | 441 | 3,000 | 14,500.49 |
| 3/25/70 | 510 | 3,000 | 11,500.49 |
| 3/27/70 | 542 | 700 | 8,500.49 |
| 3/31/70 | 571 | 2,000 | 7,800.49 |
| 4/3/70 | 577 | 2,700 | 4,800.49 |

finds no breach of a fiduciary duty when a debt is reflected in the Foundation's books and was paid by an authorized officer of the Foundation.

[redacted] The Foundation also introduced nine checks written to Dr. Musgrave in the first three months of 1970. Ex. 14. All but three of these checks bear a notation indicating the purpose for which the check was written; two of the three checks were countersigned by Joe Eversole. The remaining checks clearly show the purpose for which they were written—either to reimburse Dr. Musgrave for expenses, or to pay an obligation pursuant to a particular invoice. Two of the checks were written in payment of debts owing to Jenkins Construction for the lease of laundry equipment. The accounts payable ledger for the Foundation bears the following notation:

"Make CK payable to Dr. Musgrave."

The ledger reflects that the Foundation was indebted to Jenkins Construction at the time each payment was made. Four other checks bear notations that indicate they were issued to reimburse Dr. Musgrave for his payment of a specific invoice. Thus, these checks appear on their faces to be legitimate expenditures. The Foundation has produced no proof to the contrary.

The Foundation introduced two $500.00 checks payable to Edwin Bentley, apparently the operator or owner of B & J Coal Company. Mrs. Musgrave's signature appears on these checks but so does the signature of "Joe Eversole, Sec'y. and Treasurer" of the Foundation. Ex. 15.

Finally, the Foundation introduced one check dated January 14, 1970, in the amount of $57.75, payable to Dr. Musgrave, signed by Mrs. Musgrave. Although the check does not show the reason for which it was issued, the court declines to "presume" that any fraud was involved. The Board authorized Mrs. Musgrave to issue checks in payment of obligations of less than $500.00. The Foundation cannot be heard to complain some 12 years later. Further, the amount involved is de minimis.

X

[redacted] Lastly, the Foundation seeks an award of punitive damages against the Musgraves for fraud and misrepresentation. In *Keck v. Wacker*, 413 F.Supp. 1377 (D.C. E.D.Ky.1976), the court stated that under Kentucky law punitive damages may be given in a cause of action for fraud only when the representations in question were

> "done wilfully, maliciously, wantonly, or oppressively. Without such evidence, punitive damages cannot be granted. The conduct must be outrageous, so that the Court may punish the offender and deter others ... (citations omitted) or such damages may be granted where there is proof of gross neglect or disregard for the rights of others...." (Citations omitted). *Id.* at 1383, 1384.

The facts of the present case wholly fail to justify any award for punitive damages.

XI

The debtor's/Foundation's objections to the claims of the Musgraves will be denied. The claims, as amended, will be allowed. All other relief requested by both the debtor/Foundation and the Musgraves will be denied.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.